IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 18, 2004

### STATE OF TENNESSEE v. RICHARD A. SITERS

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S43,571      Phyllis H. Miller, Judge**

_____

**No. E2003-02075-CCA-R3-CD**
**June 21, 2004**
_____

On February 28, 2002, the defendant, Richard A. Siters, pled guilty to four counts of attempted rape, a Class C felony; one count of sexual battery, a Class E felony; and one count of attempted sexual battery, a Class A misdemeanor. The trial court sentenced the defendant to six years, suspended, and placed him on intensive supervised probation. On appeal, the defendant contends that the trial court erred in revoking his probation. We disagree and affirm the revocation.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOE G. RILEY, J., joined.

Stephen M. Wallace, District Public Defender; and Richard A. Tate, Assistant District Public Defender, for the appellant, Richard A. Siters.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Barry P. Staubus, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant's probation was subject to a variety of conditions set out in three different documents. In his guilty plea and waiver of rights executed on February 22, 2002, the defendant agreed to several conditions including, _inter alia_, Rule 1 which required "[a]bsolutely no contact with the victims or any other minors;" Rule 2, which required that he "[e]nroll in [and] complete sex offender treatment program with Melissa Crim;" and Rule 7 which made the defendant responsible for obeying "[a]ny other conditions imposed by his probation officer." The probation order, signed by the defendant on February 28, 2002, included several special conditions under Rule 14:

I will observe any special conditions imposed by the Court. . . . (3) Absolutely <u>NO CONTACT</u> with the victim or any other minors . . . . (11) Any other conditions imposed by his probation officer.

Furthermore, Rule 6 of the probation order required the defendant to follow all instructions given by his probation officer. Following this rule, the defendant agreed to and signed the Sex Offender Directives which included:

1. You shall not purchase or possess any pornographic or sexually explicit materials including but not limited to adult over the counter publications, underground publications, privately developed materials, adult cable stations, and sexually explicit computer software.

. . . .

15A. You shall have no contact with your victim(s), including correspondence, telephone contact, or communication through third parties except under circumstances approved in advance and in writing by your Officer in consultation with his/her supervisor. Sex offenders shall not enter onto the premises, travel past, or loiter near the victim's residence, place of employment, or other places frequented by the victim.

On April 14, 2003, the defendant's probation officer, Wendy Minton, filed an arrest warrant affidavit alleging that the defendant had violated Sex Offender Directive Rule 1 by possessing and viewing pornographic movies; Special Condition 3 and Sex Offender Directive Rule 15A by having contact with one of his victims; and Special Condition 11 by failing to provide written proof of attendance at sex offender treatment sessions. As a violation of Special Condition 3 and Sex Offender Directive Rule 15A, the affidavit alleged:

The victim, . . . ran away from state custody in Kingsport, Tennessee and came to visit her mother. The victim stayed overnight in her mother[] and the defendant's home and was returned to the facility the following morning by her mother.

In a phone call with [the victim] on Tuesday[,] April 8, 2003, she stated that when she arrived at her mother[] and defendant's home, the defendant was home for a short period of time before leaving for work. [The victim] stated that she was never alone with the defendant while she was in the home.

As violation of Sex Offender Directive Rule 1, the affidavit alleged:

> Count 1:  The defendant admitted to Ricky Rogers, Polygraph Examiner[,] that "he viewed two X-rated movies in November, and then threw them away after being told to do so by Dr. Lancaster, his sex offender treatment provider."

> Count 2:  The defendant admitted to Ricky Rogers, Polygraph Examiner, watching movies containing frontal nudity on satellite dish.

As violation of Special Condition 11, the affidavit alleged:

> The defendant was instructed by Community Corrections Officer Barbara Dattulo to provide monthly proof of attendance to sex offender treatment and failed to do so the months of December 2002 and February 2003.

The court conducted hearings in this matter on May 22 and July 17, 2003. At the first hearing, Wendy Minton testified that she was employed by the Tennessee Board of Probation and Parole.  She said she prepared the defendant's presentence report and met with him on February 28, 2002.  They discussed both the probation order and the sex offender directives, and he signed both. The defendant did not tell her that he did not understand either.  His case later was transferred to Bedford County, where he was placed in the community corrections program.

Barbara Dattulo testified that she was employed with South Central Human Resource Agency, working in community corrections, and was assigned to supervise the defendant.  She first met with him on March 11, 2002, and went over the behavioral contract with him which he had signed on March 1, 2002, in the presence of the program manager.  Dattulo said she had filed a violation report on August 5, 2002, based on the defendant's failure to provide written proof of his attendance at sex offender treatment classes on two separate occasions.  The defendant told her on January 24, 2003, that his class had been cancelled due to the weather, but Dattulo was unable to verify that.  Her report also alleged that the defendant had failed to pay his fines and court costs and had failed to obtain employment.  She said the defendant subsequently became employed and began paying his fines and costs but had only paid a minimal amount.

At the second hearing, Ricky Rogers testified that he was a private polygraph examiner and that he administered polygraphs for the State of Tennessee sex offender programs.  On February 27, 2003, the defendant submitted to a polygraph examination as part of his sex offender treatment. During the pretest interview, the defendant said "in November that he had viewed some x-rated movies."  The defendant said he destroyed them after his sex offender treatment provider told him to avoid sexually explicit materials and to discard any such materials that he might own.  In addition,

the defendant admitted that he had viewed movies, over his satellite dish, that featured some "frontal nudity."

Rogers said that relevant questions on the polygraph examination were whether, since the previous March, the defendant had "touched the sexual parts of anyone younger than 18," had "asked anyone younger than 18 to touch [his] sexual parts," or had viewed any pornography in addition to that he already had disclosed. The defendant's answers to these questions were "deceptive," according to Rogers. Asked by Rogers about these responses, the defendant "said that he still has, he masturbates to the sexual fantasies of the 13-year-old victim." The defendant also said that the victim, on an unspecified night in September of 2002, ran away from state custody and arrived unexpectedly at the home of her mother, who was the defendant's wife, and had spent the night. As for his then being with the victim, the defendant told Rogers that "he was there but . . . he didn't have any contact with her." Rogers could not recall whether the defendant said he stayed in the house when the victim arrived, saying, "I know the child stayed there all night. Now I don't . . . know exactly if [the defendant] stayed or if he went to work."

After the polygraph exam, the defendant disclosed the victim's visit to his sex offender treatment provider, Dr. John Lancaster. The probation officer stated in her sworn affidavit that the victim said, in an April 8, 2003, phone call, that the defendant "was home for a short period of time before leaving for work."

Dr. John Lancaster testified that he had a Ph.D. in psychology, among other degrees, was a college professor, and worked with sex offenders. The defendant was referred to his company, Sexual Trauma Programs, for treatment. He first met with the defendant on October 31, 2002, and they met weekly thereafter. One of the rules of the program was that the defendant not possess any pornographic or sexually explicit materials, and this rule was discussed with the defendant weekly. Dr. Lancaster told the defendant not to have any contact with the victims, "[n]ot even limited, don't call them, don't write them, nothing." Before receiving the defendant's polygraph results, Dr. Lancaster did not know that the defendant had watched x-rated movies or movies with frontal nudity. Likewise, the defendant had not disclosed that he had seen the victim in September. It was after Dr. Lancaster received the polygraph results that the defendant told him of the visit by the victim, saying "she came unexpectedly and that once he knew she was there he packed up and left . . . in less than a hour." As to the likelihood of the defendant "acting out" his sexual fantasies, Dr. Lancaster said the defendant's masturbating while fantasizing of the victim was "not a good sign by any stretch of the imagination," meaning "a higher probability" of acting out.

By written order entered on July 23, 2003, the trial court revoked the defendant's probation:

> It appearing to the court that the defendant was sentenced to 6 years, but that sentence was suspended and defendant placed on probation supervision on 02-28-2002, and it further appearing that the defendant has violated the terms and [c]onditions of said supervision by Violation of Special Condition # 3 "Absolutely no contact with the

victim . . ." Sex Offender Directive Rule #15A, "you shall have no contact with your victim . . . The victim . . . ran away from state custody in Kingsport, Tennessee and came to visit her mother. The victim stayed overnight in their home and was returned to the facility the following morning by her mother.

Sex Offender Directive Rule #1 "You shall not purchase or possess any pornographic or sexually explicit materials including but not limited to adult over the counter publications, underground publications, privately developed materials, adult cable stations and sexually explicit computer software. The defendant admitted to Dr. Lancaster, his sex offender treatment provider, that he viewed two X-rate[d] movies in November, and then threw them away after being told to do so by Dr. Lancaster.

It is therefore ordered that the supervision aforesaid is, and the same [is] hereby revoked, and the defendant is ordered to serve the sentence of 6 years [s]entence in the Tennessee Department of Correction.

## ANALYSIS

The defendant argues that the trial court abused its discretion in revoking his probation, saying that "the ends of justice and the interest of the public and the [defendant] are not best served by having the [defendant] to serve his sentence."

A trial court is granted broad authority to revoke a suspended sentence and to reinstate the original sentence if it finds by the preponderance of the evidence that the defendant has violated the terms of his or her probation and suspension of sentence. Tenn. Code Ann. §§ 40-35-310, -311 (2003). The revocation of probation lies within the sound discretion of the trial court. State v. Harkins, 811 S.W.2d 79, 82 (Tenn. 1991); State v. Stubblefield, 953 S.W.2d 223, 226 (Tenn. Crim. App. 1997); State v. Mitchell, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991). To show an abuse of discretion in a probation revocation case, "a defendant must demonstrate 'that the record contains no substantial evidence to support the conclusion of the trial judge that a violation of the conditions of probation has occurred.'" State v. Wall, 909 S.W.2d 8, 10 (Tenn. Crim. App. 1994) (quoting State v. Delp, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980)). The proof of a probation violation need not be established beyond a reasonable doubt, but it is sufficient if it allows the trial court to make a conscientious and intelligent judgment. Harkins, 811 S.W.2d at 82 (citing State v. Milton, 673 S.W.2d 555, 557 (Tenn. Crim. App. 1984)). We review this issue, therefore, for an abuse of discretion.

The defendant admitted, during his polygraph examination, that he possessed two x-rated movies. He argues that he disposed of the movies after his first meeting with Dr. Lancaster on

October 31, 2002, when he was instructed to do so. However, Sex Offender Directive Rule 1, which the defendant had signed on February 28, 2002, provided that he was not to "purchase or possess any pornographic or sexually explicit materials." Although the defendant asserts that he disposed of the movies after being told by Dr. Lancaster to do so, the fact remains that he was not supposed to have them in the first place. Consequently, we cannot conclude that the court abused its discretion in finding that he violated Sex Offender Directive Rule 1.

As to the victim's coming to his house and spending the night, although the defendant claims that he did not remain on the premises, Special Condition 3 provided that he have "[a]bsolutely NO CONTACT" with the victim, and Sex Offender Directive Rule 15A provided that he "have no contact" with his victim. The defendant contends that he did not violate the terms of his probation because, although he was in the house for a brief period with the victim, they had no contact. However, the stricture against contact with the victim clearly includes more than simple physical contact. Indeed, Sex Offender Directive Rule 15A, which the defendant was charged with violating, reads, "You shall have no contact with your victim(s) . . . . Sex offenders shall not enter onto the premises, travel past, or loiter near the victim's residence, place of employment, or other places frequented by the victim." The broad prohibition against "contact" with the victim was clearly intended to prohibit the defendant's admitting the victim into his home and remaining there even for what he claims was only a brief time. We cannot conclude that the court abused its discretion in determining that the defendant violated these rules as well.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the trial court's revocation of the defendant's probation and reinstatement of his original sentence.

_____
ALAN E. GLENN, JUDGE

-6-